IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

**ADMIRAL INSURANCE COMPANY,** §
**INC. and MONITOR LIABILITY** §
**MANAGERS, INC.,** §
§
         Appellants, §
§
v. §    Civil Action No. **3:11-CV-0450-L**
§
**ARROWOOD INDEMNITY COMPANY,** §
*formerly known as* Royal Indemnity Company, §
§
         Appellee. §

<u>**MEMORANDUM OPINION AND ORDER**</u>

Before the court are the appeal of Admiral Insurance Company, Inc. and Monitor Liability Managers, Inc., filed April 4, 2011; and the cross-appeal of Arrowood Indemnity Company, filed May 5, 2011.[1] After consideration of the briefs, replies, record on appeal, and the applicable law, the court **affirms in part** and **reverses in part** the judgment of the bankruptcy court entered on October 25, 2010.

**I.    Factual and Procedural Background**

The bankruptcy court, in its April 30, 2010 findings, adopted the stipulated facts set forth in the parties' joint Proposed Pretrial Order, filed November 23, 2009. The court recites many of the facts here, as they are necessary for clarity and understanding of this opinion.

The Cool Partners, Inc. d/b/a Coollink Broadcast Network (the "Debtor" or "Cool Partners") was a privately held Texas corporation originally established in 1998. The Debtor's

---

[1] Admiral Insurance Company, Inc. and Monitor Liability Managers, Inc. requested oral argument; however, the court determines that oral argument is unnecessary to resolve the issues presented in their appeal and Arrowood Indemnity Company's cross-appeal. Accordingly, the court denies their request for oral argument.

business involved owning, developing, and marketing internet applications and also serving as an internet service provider. The Debtor raised approximately $20 million in capital through securities sales to investors. On January 22, 2002, the Debtor filed a voluntary bankruptcy petition under Chapter 7, Case No. 02-30446-HDH-7, (the "Bankruptcy Case"). Robert Yaquinto ("the Trustee") was the trustee in bankruptcy for the Debtor at all relevant times.

Prior to the bankruptcy, the Debtor had obtained director and officer liability insurance policies ("D&O Insurance") from two insurers: Admiral Insurance Company, Inc. ("Admiral") and Arrowood Indemnity Company, Inc., formerly known as Royal Indemnity Company ("Royal"). Admiral and Monitor Liability Managers, Inc. ("Monitor") are sister companies, both owned by a common parent, W.R. Berkley. The policy purchased from Admiral (the "Admiral Policy") covered a period from January 10, 2000, to January 24, 2002. The Admiral Policy provided primary, claims-made D&O insurance, subject to a $5 million aggregate limit. Payment of defense costs eroded the Admiral Policy limits. The Debtor purchased from Royal an Excess Directors and Officers Liability and Company Reimbursement Policy for the policy period from May 9, 2000, to January 24, 2002 (the "Royal Policy"). The Royal Policy provided excess, claims-made D&O coverage in excess of the $5 million Admiral Policy. The Royal Policy had a $5 million aggregate limit of liability each policy year, in excess of the $5 million Primary and Underlying Excess Limit of Liability, as set forth in the Schedule of Underlying Insurance, which listed the Admiral Policy, No. 6251421.

Prior to the filing of the Bankruptcy Case, the Debtor and certain of its directors and officers were named as defendants in various lawsuits by investors. The investors believed that they had been defrauded and their purchases should be rescinded. The Debtor and its directors and officers (the "Insureds") sought coverage under the Admiral and Royal policies for several

investor lawsuits ("Underlying Lawsuits") against them for fraud and rescission.  One of the Underlying Lawsuits brought against the Debtor and certain of its directors and officers was the "Rosenthal Action" (*Rosenthal, et al. v. Cool Partners, Inc., et al.,* Cause No. 02-00984-E, County Court at Law No. 4, Dallas County, Texas), which involved, *inter alia*, a securities fraud suit filed in Texas state court against the Debtor and a number of its directors and officers.  The claimants in the Rosenthal Action alleged, *inter alia*, causes of action arising out of the Rosenthal defendants' alleged fraud, misrepresentation, and negligence in connection with the Rosenthal defendants' efforts to have the Rosenthal claimants invest in the Debtor and subsequently maintain those investments.  The Pegasus Action (*Yaquinto, Trustee v. Richard Millman, et al.,* Cause No. 02-30446-HDH, Chapter 7 Adversary No. 04-03049-HDH, Bankr. N.D. Tex.) was not related to any transactions between the Rosenthal claimants and the Debtor.

Admiral denied coverage for the Underlying Lawsuits, and on February 14, 2002, it filed an Original Complaint and Request for Declaratory Judgment (the "Admiral Declaratory Judgment Action") in an action styled *Admiral Ins. Co. v. Christian Briggs, et al.,* No. 3:02-cv-0310, in the United States District Court for the Northern District of Texas, Dallas Division. Admiral asserted that the Admiral Policy should be rescinded because of misrepresentations the Debtor allegedly made in the Policy applications.  Under the Admiral Policy's reservation-of-rights clause, Admiral provided a defense for the Insureds in the Underlying Lawsuits, and hired six sets of defense counsel to defend these suits against the officers and directors.  Royal also denied coverage under the Royal Policy on grounds similar to those asserted by Admiral.

On January 21, 2004, the Trustee filed a Complaint for Declaratory Judgment against Admiral as an adversary proceeding in the Bankruptcy Case, alleging that Admiral had refused to defend or indemnify Cool Partners with respect to the "CB Parkway Action" and two other

**Memorandum Opinion and Order- Page 3**

cases, the "Barnidge Action" and the "Fiorentino Action") (the "Trustee v. Admiral Declaratory Judgment Action").   The Admiral Declaratory Judgment Action and the Trustee v. Admiral Declaratory Action were consolidated as an adversary proceeding in the Bankruptcy Case ("Consolidated Admiral Coverage Litigation").   On January 20, 2004, the Trustee filed a Complaint for Declaratory Judgment against Royal ("Trustee v. Royal Declaratory Judgment Action") as an adversary proceeding in the Bankruptcy Case.   The Trustee's complaint alleged, *inter alia*, that counsel for Royal sent the Trustee a letter purporting to rescind coverage under the Royal Policy and declaring the Royal Policy "null and void."   The Trustee sought a declaratory judgment that the Royal Policy was in effect and obligated Royal to defend and indemnify the Trustee for covered claims.

The Trustee, Admiral, and Royal, among others, attended a mediation in April 2004.   At the April 2004 mediation, there were discussions between Admiral and Royal of a scenario in which Admiral would tender its policy limits (to demonstrate that Admiral had "exhausted" its $5 million limit) but would receive a right to recoup part of the policy limits.   Royal rejected any such settlement and advised that such a scenario would not result in exhaustion of the policy limits and that such "deal" would not trigger Royal's policy.   The cases did not settle at the April 2004 mediation.

In July 2005, Geoff Harper, counsel for the Trustee, informed Admiral that his formal demand to settle was $6.2 million, but that he thought he could get his clients to settle for $3.75 million.   This demand was never communicated to Royal.   At this point, the Admiral policy still had at least $3 million left on its limits.   Further, in August 2005, Mr. Harper discussed with Admiral a global settlement, which involved a complete release to the officers and directors in exchange for policy limits.   Admiral rejected the offer and never reported it to Royal.

**Memorandum Opinion and Order- Page 4**

Mr. Harper sent letters to both Admiral and Royal requesting their remaining policy limits in full settlement of the Plaintiff's claims. Later they attended a second mediation in Dallas, Texas, on September 30, 2005, with mediator Hesha Abrams. Additionally, as of September 30, 2005, some of the attorneys representing the directors and officers in the Underlying Lawsuits had outstanding invoices that had not been paid (the "Incurred Fees").

At the mediation, the mediator adviser Royal that Admiral had settled with the Trustee and with the Rosenthal Plaintiffs for a total payment of $3,591,078.17, which represented the difference between the $1,408,921.83 in defense and indemnity costs paid by Admiral prior to September 30 and the Admiral Policy limits of $5 million. The mediator advised Royal that the outstanding unpaid legal fees incurred by defense counsel prior to September 30, totaling approximately $1 million in unpaid invoices and $600,000 in work in progress, were the responsibility of Royal. Geoff Harper made similar, and inaccurate, representations to Royal. For Royal, the litigation against its insured was "quite dangerous, costly and immediate"; therefore, Royal entered into a "high/low" settlement agreement with the Trustee on October 10, 2005, based on the outcome of a summary judgment motion. R. 000021, ¶ 32.

The Admiral Settlement Agreement and Policy Release (the "Admiral Settlement Agreement") with the Trustee was entered into on November 30, 2005, and a copy of the Admiral Settlement Agreement was attached to the Motion to Approve the Admiral Settlement. A copy of the Pegasus Settlement Agreement was attached to the Motion to Approve the Pegasus Settlement. The Royal Settlement with the Trustee was entered into in early December 2005, and a copy of the Royal Settlement Agreement was attached to the Motion to Approve the Royal Settlement. On December 8, 2005, the Motions to approve the Royal, Admiral, and Pegasus

Settlement Agreements, with attached agreements, were publicly filed in the Bankruptcy Case, in that order.

Attorneys for Royal were served with and reviewed a copy of the Admiral Settlement Agreement with the Trustee within a few days after the Admiral Settlement was filed in the Bankruptcy Case on December 8, 2005. Royal had requested a copy of the written settlement agreement reached in the September 30, 2005 mediation from Mr. Harper on October 3, 2005, prior to agreeing to its own settlement. Mr. Harper, however, stated to Royal that a written agreement did not exist. This representation was not accurate, because a written agreement between the Trustee and Admiral that was signed on September 30, 2005, was produced in connection with the trial of this proceeding, and Mr. Harper had signed it. Further, Mr. Harper led Royal to believe that it was responsible for approximately $1.6 million in pending defense costs, when the Trustee had agreed to pay those costs as part of the mediated settlement on September 30, 2005.

On December 20, 2005, a hearing was held on the motions to Approve the Settlement Agreements with Admiral, Pegasus, and Royal before the bankruptcy court in the Bankruptcy Case. At the hearing, counsel for Royal stated to the bankruptcy court that Royal was unaware of the recoupment, worth approximately $1 million dollars, that Admiral would receive from its settlement. Counsel for Royal stated unequivocally that Royal reserved all of its rights with respect to this matter as it relates to Admiral. On December 22, 2005, the bankruptcy court entered in the Bankruptcy Case an Order granting Motion to Approve Settlement Agreement with Admiral Insurance Company. Royal did not appeal that Order. On December 23, 2005, the bankruptcy court entered in the Bankruptcy Case an Order Granting Motion to Approve

Settlement Agreement with Royal Indemnity Company.  Admiral paid the Trustee $3,591.078.17 on December 27, 2005.

On or before December 27, 2005, the Trustee, Admiral, and certain insured directors and officers executed the "Admiral Settlement Agreement and Policy Release."  Pursuant to the Admiral Settlement Agreement and the bankruptcy court's Order Granting Motion to Approve Settlement Agreement with Admiral Insurance Company, the Trustee, certain insured directors and officers, and Admiral filed and Agreed Motion and Stipulation of Dismissal with Prejudice in the Admiral Declaratory Judgment Action and the Trustee v. Admiral Declaratory Judgment Action in December 2005.

Royal paid to the Trustee the consideration required under the Royal Settlement Agreement on December 29, 2005.  On July 25, 2006, the Trustee filed in the Bankruptcy Case a Motion for Interim Distribution to Creditors, seeking authorization of an interim distribution to unsecured creditors holding allowed claims, including Monitor, of approximately 50 percent of the anticipated dividend to each such creditor's claim (the "Interim Distribution Motion").

The bankruptcy court entered its Order dated August 29, 2006, in the Bankruptcy Case, granting the Interim Distribution Motion, and the Trustee distributed to Monitor, as the holder of allowed unsecured claims, the sum of $516,798.58 as an interim distribution.

Royal filed an action against Admiral and Monitor in the Superior Court of New Jersey in Camden, New Jersey on March 20, 2007, Docket No. L-1544 (the "New Jersey Action").  Admiral and Monitor made demand on the Trustee for indemnification against the claims and expenses, including attorney's fees, resulting from the New Jersey Action on April 27, 2007, and thereafter.

The Trustee received such demand in April 2007 but has not indemnified Admiral or Monitor against any claims or expenses, including reasonable attorney's fees, resulting from the New Jersey Action or the cross-claims of Royal against Admiral and Monitor in this action. The Trustee and Admiral have now settled the indemnity claims.

The Trustee filed the present adversary proceeding on November 20, 2007. The court in the New Jersey Action on February 1, 2008, dismissed the New Jersey Action without prejudice on the basis of *forum non conveniens.*

## II.                Legal Standard-Bankruptcy Appeals

In a bankruptcy appeal, district courts review bankruptcy court rulings and decisions under the same standards employed by federal courts of appeal: a bankruptcy court's findings of fact are reviewed for clear error, and its conclusions of law *de novo. Robertson v. Dennis (In re Dennis)*, 330 F.3d 696, 701 (5th Cir. 2003); *Century Indem. Co. v. National Gypsum Co. Settlement Trust (In re National Gypsum Co.)*, 208 F.3d 498, 504 (5th Cir.), *cert. denied,* 531 U.S. 871 (2000).

A bankruptcy court's "findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous." Fed. R. Bankr. P. 8013. A finding is clearly erroneous and reversible only if, based on the entire evidence, the reviewing court is left "with the definite and firm conviction that a mistake has been made." *In re Dennis*, 330 F.3d at 701 (citation omitted). In conducting this review, the court must give due regard to the opportunity of the bankruptcy judge to determine the credibility of the witnesses. *Id.*; *Young v. National Union Fire Ins. Co. (In re Young),* 995 F.2d 547, 548 (5th Cir. 1993) (quoting Fed. R. Bankr. P. 8013).

### III.     Analysis

#### A.  Findings of Fact

Having reviewed the briefs of the appellants and appellee, replies, record on appeal, and the findings of fact entered by the bankruptcy court on April 30, 2010, the court affirms the findings of fact of the bankruptcy court, except that pertaining to its finding as to the amount of damages.  The bankruptcy court's findings of fact, except with respect to the amount of damages, are not clearly erroneous and will not be set aside.

#### B.  Conclusions of Law: Appeal by Admiral

Admiral appeals the bankruptcy court's judgment holding Admiral and Monitor liable to Royal on the legal theories of "equitable subrogation" and "unjust enrichment."   Admiral contends that the damages awarded to Royal were not proved by the evidence and that there is no basis upon which the court could ignore the legal separateness of Admiral and Monitor.  Admiral also asserts that section 38.001 of the Texas Civil Practices and Remedies Code does not permit the recovery of attorney's fees under the facts and circumstances of this case.    Royal maintains that the bankruptcy court's judgment did not err on any of these grounds.

#### 1.  Royal's Equitable Subrogation Claim

Royal contends that Admiral and Monitor are liable to it on the basis of equitable subrogation.  Admiral contends that, under Texas Law, the doctrine of equitable subrogation is limited to the *Stowers*[2] context, and Royal has failed to prove that Admiral or Monitor breached a *Stowers* duty to the insureds under the Admiral Policy.

---

[2] *See G. A. Stowers Furniture Co. v. American Indem. Co.*, 15 S.W.2d 544, 547 (Tex. Comm'n App. 1929). Admiral refers to the duty of an insurer to protect the insured by accepting a reasonable settlement offer within policy limits.

Pursuant to Texas law, an excess carrier may bring an equitable subrogation action against the primary insurer. *American Centennial Ins. Co. v. Canal Ins. Co.*, 843 S.W.2d 480, 482 (Tex. 1992). "Under this theory, the insurer paying a loss under a policy becomes equitably subrogated to any cause of action the insured may have against a third party responsible for the loss." *Id.* In holding that an excess carrier may bring an equitable subrogation action against the primary carrier, the Texas Supreme Court explained that "this does not, however, impose new or additional burdens on the primary carrier, since [its] prior decisions in *Stowers* and *Ranger County*[3] imposed clear duties on the primary carrier to protect the interests of the insured." *American Centennial*, 843 S.W.2d at 483. "The primary carrier should not be relieved of these obligations simply because the insured has separately contracted for excess coverage." *Id.* "In this situation, where the insured has little incentive to enforce the primary carrier's duties, the excess carrier should be permitted to do so through equitable subrogation." *Id.*

The Texas Supreme Court later clarified that there are two types of subrogation. *Mid-Continent Ins. Co. v. Liberty Mut. Ins. Co.*, 236 S.W.3d 765, 774 (Tex. 2007).

> Contractual (or conventional) subrogation is created by an agreement or contract that grants the right to pursue reimbursement from a third party in exchange for payment of a loss, while equitable (or legal) subrogation does not depend on contract but arises in every instance in which one person, not acting voluntarily, has paid a debt for which another was primarily liable and which in equity should have been paid by the latter.

*Id.* (citation omitted). "In either case, the insurer stands in the shoes of the insured, obtaining only those rights held by the insured against a third party, subject to any defenses held by the third party against the insured." *Id.* (citation omitted). "*Stowers* is the only common law tort

---

[3] *Ranger County Mut. Ins. Co. v. Guin*, 723 S.W.2d 656, 659 (Tex. 1987).

**Memorandum Opinion and Order- Page 10**

duty in the context of third party insurers responding to settlement demands." *Mid-Continent*, 236 S.W.3d at 776. (citation omitted).

In *Mid-Continent*, the court addressed a certified question from the Fifth Circuit that asked whether one insurer owed a duty to another insurer, when the two insurers (providing the same insured primary insurance liability coverage) cooperatively assumed the defense of the suit against their common insured and the case settled for an amount one of the insurers contended was excessive. Liberty Mutual Insurance Co. ("Liberty Mutual") and Mid-Continent Insurance Co. ("Mid-Continent") provided the same insured primary insurance liability under policies with $1 million limits. Liberty Mutual also provided the insured coverage under a $10 million excess policy. The two insurers admitted coverage and cooperatively assumed the defense of the suit against their common insured. Liberty Mutual procured an offer to settle for $ 1.5 million, which the Fifth Circuit deemed reasonable, and demanded that Mid-Continent contribute $750,000; however, Mid-Continent valued the case at no more than $300,000, which the Fifth Circuit deemed unreasonable, and contributed only $150,000. The case ultimately settled for $1.5 million, with Liberty Mutual funding $1.35 million of the settlement.

The Texas Supreme Court held that in this instance there was no duty of reimbursement between the co-primary insurers. It also held that the insured did not have any rights to which Liberty Mutual could be subrogated because the insured had no common law cause of action against Mid-Continent and, since the insured was fully indemnified, it had no rights to recover an additional pro rata portion of the settlement from Mid-Continent. The court stated:

> In *Canal*, we recognized equitable subrogation as a basis for an excess insurer's recovery against a primary insurer to prevent a primary insurer from taking advantage of an excess insurer, acting solely as such, when a potential judgment approaches the primary insurer's policy limits. The excess insurer would be forced to pay for a debt for which another insurer was primarily liable. In this

case, however, Liberty Mutual played a dual role as primary insurer and excess insurer and was in a position to negotiate a good faith settlement on [the insured's] behalf. Equity demanded a remedy for the excess insurer in *Canal*, but here equity does not favor such a remedy. A reasonable primary insurer, which did not improperly handle the claim, would not pay more than its primary policy limits.

*Mid-Continent*, 236 S.W.3d at 776 (internal citations omitted).

The bankruptcy court relied on *Royal Insurance Company of America v. Caliber One Indemnity Company*, 465 F.3d 614 (5th Cir. 2006).   In *Caliber One*, Methodist Retirement Communities ("Methodist") purchased primary and excesses insurance coverage for both general and professional liability covering Turner Geriatric Center and its employees.   Hartford Underwriters Insurance Company ("Hartford") provided $1 million in primary coverage from April 1, 1997, to April 1, 1999, for medical incidents and occurrences under a general liability policy. Caliber One Indemnity Company ("Caliber One") provided $1 million of primary coverage from April 1, 1999, to July 1, 2000.   Royal Insurance Company of America ("Royal Insurance") provided excess coverage from April 1, 1999, to July 1, 2000.   Hartford and Caliber One shared the costs of defending Methodist while preserving their respective rights to deny coverage.

The Trevino family, bringing suit in state court for wrongful death and a survival action against Turner Geriatric Center, offered to settle for $3 million. Methodist sent a *Stowers* demand letter to Caliber One, Hartford, and Royal Insurance requesting all to accept the settlement offer. Correspondence from Methodist indicates that it thought it only had $1 million in primary coverage, but Royal believed that the policy limits of both the Caliber One and Hartford policies were available because there had been multiple occurrences. The Trevino family's suit settled for $2 million. Caliber One, Hartford, and Royal Insurance contributed

$800,000, $200,000, and $1 million, respectively. Royal's contribution was made under protest, and it sued Hartford and Caliber One to recover the $1 million paid. The parties consented to conduct all proceedings before a United States Magistrate Judge. The magistrate judge found that in Texas an excess carrier can seek equitable subrogation against primary insurers only when the claim is predicated on the violation of a tort duty owed to the insured, and the only tort theory so actionable by an insured is negligence. The magistrate judge also found that because Methodist had indicated that it only had $1 million in primary coverage at the time it made the settlement demand, this was an admission by the insured that was binding on Royal. The magistrate judge concluded that the primary insurers had done all that Methodist asked. The magistrate judge concluded that neither of the primary carriers was negligent.

On appeal, the Fifth Circuit began by noting that it did not agree with the magistrate judge's interpretation of Texas law regarding excess carriers' causes of action against primary carriers. It distinguished *American Centennial* from the issue presented by *Caliber One*. The court stated that the issue in *American Centennial* "was *not* whether an excess carrier had subrogation rights to recover amounts that a primary insurer should have paid under its policy terms and limits." *Caliber One*, 465 F.3d at 617-618 (emphasis added). The basis of this distinction was the duty of a primary carrier to exhaust its policy limits *before* the excess policy is triggered. In *Caliber One*, the court explained that in saying that an excess carrier's "only cause of action is for negligence," (quoting *American Centennial*, 843 S.W.2d at 486 (Hecht, J., concurring, joined by four justices)), the Texas Supreme Court was not saying that contractually based rights were foreclosed; the Texas Supreme Court was simply placing limits on the availability of tort and extra-contractual remedies. *Caliber One*, 465 F.3d at 618. The Fifth Circuit reasoned that a "Texas court of appeals had no difficulty concluding that when an excess

carrier sued to recover a primary carrier's policy limits after the excess carrier had paid an agreed

judgment, the excess carrier had stated a cause of action for subrogation."  *Id.* (citing *Argonaut*

*Ins. Co. v. Allstate Ins. Co.*, 869 S.W.2d 537, 543 (Tex. App.—Corpus Christi 1993, writ

denied)).  The Fifth Circuit went on to state:

> In its motion for summary judgment, Royal characterized its claim against Hartford and Caliber One as one for equitable subrogation. Royal has maintained throughout the district court proceedings and this appeal that the primary carriers were required to exhaust their policy limits before Royal's excess policy was triggered based on a provision in Royal's policy with Methodist. Royal made plain that it was seeking subrogation under Texas law. *No allegation or proof of negligence was required.*

*Caliber One*, 465 F.3d at 620 (footnote omitted) (emphasis added).  The court ultimately held

that Royal Insurance was allowed to file a claim based on equitable subrogation.  Additionally,

the court concluded that an insured could not decrease its primary policy limits in a way that was

detrimental to its excess carrier.

> An insured cannot reduce its primary policy limits to the detriment of its excess carrier any more than it can expand those limits. To allow Methodist to estop its excess carrier would give Methodist the unilateral right to determine when primary policy limits were exhausted within the meaning of its excess policy. The limits of the primary policies are questions to be determined by the policies themselves, not the insured, just as the question of whether those limits have been exhausted is determined by the policies.

*Caliber One*, 465 F.3d at 621.

Here, too, the court finds that Royal has stated a claim for equitable subrogation when

Admiral superficially exhausted its limits by receiving unsecured bankruptcy claims, worth

approximately $1 million, in exchange for purportedly tendering its policy limits.  The court

determines that Admiral did not exhaust its policy limits and that Royal, under the theory of

"equitable subrogation," may sue and has satisfied the requirements to recover Admiral's

remaining policy limits.  Royal characterized its claim against Admiral as one for equitable

**Memorandum Opinion and Order- Page 14**

subrogation.  Royal has maintained throughout the bankruptcy court proceedings and this appeal that Admiral was required to exhaust its policy limits before Royal's excess policy was triggered. As the bankruptcy court noted, Royal objected to contributing to any settlement that did not first involve complete exhaustion of the Admiral Policy limits. R. 000020, ¶ 29.

As stated by the court in *Mid-Continent*, "equity demanded a remedy for the excess insurer in *Canal.*" 236 S.W.3d at 776.  Likewise, equity also demands a remedy for Royal in this instance.  The court recognizes that *Stowers* is the only common law tort duty in the context of third-party insurers responding to settlement demands; however, the court need not address the particulars of *Stowers*, as no allegation or proof of violation of a tort duty was required here when Admiral failed to exhaust its policy limits.  *See Caliber One*, 465 F.3d at 620.

### 2.   Unjust Enrichment

The bankruptcy court found, in the alternative, that Royal is entitled to recover the value of the claims Admiral received in the Bankruptcy Case under a theory of unjust enrichment.  The bankruptcy court determined that Admiral's receipt of the bankruptcy claims amounted to "an overpayment by Royal that should have been borne by Admiral, or a payment to Admiral on account of the claim it received via its settlement agreement with the Trustee, that should have gone to Royal."  R. 000035, ¶ 20.  The court, having ruled that Royal has stated and satisfied the requirements for a claim for equitable subrogation, finds it unnecessary to determine whether Admiral was unjustly enriched by any "overpayment" made by Royal.

### 3.   Value of the Payment Made to Admiral (or Monitor)

The bankruptcy court found that Royal is entitled to recover from Admiral and Monitor $987,981.86, representing the value of the Pegasus Claims transferred to Admiral (given to Monitor via an assignment directed by Admiral) as well as interest from the date of payment. R.

000036, ¶ 24.   Admiral contends that Royal presented no probative evidence at trial as to the value of the Pegasus Claims transferred to Monitor pursuant to the trial court's order approving the Admiral Settlement on December 22, 2005.  Specifically, Admiral states that the measure of damages in an equitable subrogation claim is "[t]he difference between what it was required to pay and what it would have paid but for the primary carrier's negligent handling of the action, plus interest." *American Centennial*, 843 S.W.2d at 485 (Hecht, J., concurring, joined by four justices).   In *Caliber One*, however, the court found that Caliber One (primary carrier) was required to exhaust its policy limits of $1 million before Royal Insurance (excess carrier) was obligated to indemnify Methodist, and Royal Insurance was, thus, able to sue to recover the amount by which the primary insurers failed to exhaust their limits.  *Caliber One*, 465 F.3d at 616, 625.  The court finds that the value of the Pegasus Claims transferred to Admiral may be recovered by Royal, as it is the amount by which Admiral failed to exhaust its policy limits.

Admiral further asserts that, under an "unjust enrichment" theory of recovery, it was Royal's burden to present competent evidence as to the fair market value of the property transferred to Monitor (the Pegasus Claims), at the time of transfer.  Admiral argues that Royal attempted to justify the $ 987,981.86 it claimed by pointing out that:

> (a) the [c]ourt approved a distribution to the holders of unsecured claims, including Monitor, in the [third] [q]uarter of 2006; (b) that the Trustee in March 2009 proposed a further distribution to holders of unsecured claims in the [third] quarter of 2009, and (c) the sum of the $516,798.58 distributed to Monitor pursuant to court order in late 2006 and the amount proposed by the Trustee in March 2009 to be later distributed to Monitor together total $987,981.86.

Br. of Appellants 34.  Admiral contends that none of the above is evidence of what the fair market value of the Pegasus Claims actually was when they were transferred to Monitor on December 22, 2005.  As the court has not found Admiral liable under an unjust enrichment

theory, the court finds that the appropriate measure of damages is not the fair market value of the Pegasus Claims on the date of transfer, but rather the amount by which Admiral failed to exhaust its policy.  The evidence demonstrates that Admiral was aware well, before the bankruptcy court approved its settlement agreement and the Pegasus Claims were transferred, that such claims would permit distributions totaling approximately $1 million. *See* R. 007624; R. 007643-45, R. 007883; R. 007896-97.

Admiral asserts that the actual amount of the court-approved distributions to Monitor by the Trustee with respect to the Pegasus Claims was established by stipulation, and was over $64,000 less than the amount awarded to Royal in the judgment.  Royal did not respond to this argument; nevertheless, the court agrees with Admiral.  The bankruptcy court does not provide the basis for its award of $987,981.86.  It appears that the bankruptcy court added the amounts distributed to Monitor, as a holder of unsecured claims, as stated in the "Trustee's Final Report, Application for Compensation, and Report of Proposed Distribution," ("Final Report") dated March 12, 2009: $466,798.58 and $50,000.  In addition, the court added the amounts proposed by the Trustee in the March 12, 2009 Final Report to be later distributed to Monitor: $425,596.54 and $45,586.74.  These amounts together total: $987,981.86.  Royal's concedes that the $987,981.86 it requested and the bankruptcy court awarded stems from the Trustee's Final Report.  Br. of Appellee 26.  This figure represents an amount that the Trustee proposed, prior to trial in 2009, to be able to distribute to Monitor with respect to the Pegasus Claims.  This, however, was only a projection.

Royal asserts that Admiral waived its objection as to the $987,981.86 amount because it is the same amount requested in Royal's May 21, 2010 Motion for Judgment and the amount presented to the bankruptcy court at the September 9, 2010 hearing on Royal's Motion for Final

Judgment.  Royal states that Admiral did not object to the $987,981.86 amount at the hearing, but rather conceded to that value.  Br. of Appellee 26-27.

The bankruptcy court issued its Findings of Facts and Conclusions of Law on April 30, 2010, and signed its final judgment on October 25, 2010.  Between this time, on October 14, 2010, Admiral, Monitor, Royal, and the Trustee *stipulated and agreed to* the amounts of the court approved distributions to Monitor by the Trustee with respect to the Pegasus Claims. Royal's arguments overlook the stipulation it entered into on October 14, 2010.  The stipulated amount of the distributions totals $923,415.85, and it is binding on the parties.  The bankruptcy court erred in finding that the appropriate amount of the value of the bankruptcy claims was $987,981.86, in light of the stipulation made prior to its entry of its final judgment.  The court believes that this finding was an oversight by the bankruptcy court; however, it does not reflect the correct amount of damages that should have been found.  The court finds that the stipulated and undisputed amount of $923,415.85 is the appropriate amount of damages to be awarded to Royal.

### 4.   Joint and Several Liability of Admiral and Monitor

Admiral contends that the bankruptcy court ignored the legal separateness of Admiral and Monitor and effectively treated them as a single entity by finding that Admiral and Monitor were jointly and severally liable for all relief awarded.   Admiral asserts that Royal did not plead or prove alter ego or any other legal theory under which the corporate veil could be pierced.  Royal contends that the bankruptcy court properly found Admiral and Monitor jointly and severally liable to Royal given Texas's strong public policy against collusive settlements and other similar arrangements that work to collude against an insurance carrier or distort the true positions of the

parties.  Royal also argues that the bankruptcy courts are inherently courts of equity with broad remedial powers, and equitable principles govern the exercise of bankruptcy jurisdiction.

Royal asserts that the evidence at trial proved, "while the Admiral policy was written on Admiral paper, Monitor underwrote the policy, Monitor received the premiums paid on the policy, Monitor handled claims submitted under the policy, and Monitor paid defense costs and indemnity due under the policy."   Br. of Appellee 33.   Although the evidence at trial demonstrates that Admiral's and Monitor's operations were to some extent interrelated,  Royal has not demonstrated, and the court does not find, that there is a legal basis for which it may hold Admiral and Monitor, separate corporations, jointly and severally liable.

Admiral and Monitor do not meet the requirements for joint and several liability under Texas's Proportionate Responsibility statute.  The court has not found them to be tortfeasors where the percentage of responsibility attributed to them is greater than 50% or found that Admiral and Monitor, with the specific intent to do harm to others, acted in concert to engage in conduct described in the Penal Code.  *See* Tex. Civ. Prac. & Rem. Code Ann. § 33.013(b).

There are three broad categories in which a court may pierce the corporate veil: (1) the corporation is the alter ego of its owners and/or shareholders; (2) the corporation is used for illegal purposes; and (3) the corporation is used as a sham to perpetrate a fraud.  *Rimade Ltd. v. Hubbard Enters., Inc.*, 388 F.3d 138, 143 (5th Cir. 2004).  The Texas Business Corporations Act sets additional requirements, which are not applicable here, for piercing the corporate veil in cases based on claims of breach of contract.  *Id.*

Under Texas law, "the alter ego doctrine allows the imposition of liability on a corporation for the acts of another corporation when the subject corporation is organized or operated as a mere tool or business conduit."  *Gardemal v. Westin Hotel Co.*, 186 F.3d 588, 593

(5th Cir. 1999) (citation omitted).   "It applies when there is such unity between the parent

corporation and its subsidiary that the separateness of the two corporations has ceased and

holding only the subsidiary corporation liable would result in injustice." *Id.* (internal quotation

marks and citation omitted).   Texas courst also recognize the "single business enterprise" theory,

which imposes derivative liability in a slightly different context: "when corporations are not

operated as separate entities but rather integrate their resources to achieve a common business

purpose, each constituent corporation may be held liable for debts incurred in pursuit of that

business purpose." *Fluorine on Call Ltd. v. Fluorogas Ltd.*, 380 F.3d 849, 861 (5th Cir. 2004)

(citing *Paramount Petroleum Corp. v. Taylor Rental Ctr.*, 712 S.W.2d 534, 536 (Tex. App.—

Houston [14th Dist.] 1986, writ ref'd n.r.e.).

> Factors to be considered in determining whether the constituent corporations have
> not been maintained as separate entities include but are not limited to the
> following: common employees; common offices; centralized accounting; payment
> of wages by one corporation to another corporation's employees; common
> business name; services rendered by the employees of one corporation on behalf
> of another corporation; undocumented transfers of funds between corporations;
> and unclear allocation of profits and losses between corporations.

*Paramount Petroleum*, 712 S.W.2d at 536 (citations omitted).

The "illegal purpose" theory "relates to the use [of] the corporate form as a technique for

avoiding legal limitations on natural persons or corporations."   *Pan Eastern Exploration Co. v.*

*Hufo Oils*, 855 F.2d 1106, 1132 (5th Cir. 1988).  This theory differs from alter ego because it can

be used even when all corporate formalities have been kept. *Id.*   "There are few cases that

illustrate this strand of corporate disregard in any pure form; in practice, the illegal purpose

rationale is usually an alternative basis in an alter ego or 'sham to perpetrate fraud' case."   *Id.*

The "sham to perpetrate a fraud" basis for corporate disregard rests upon the abuse of corporate

forms as part of a basically unfair device to achieve an inequitable result.   *Gibraltar Sav. v.*

**Memorandum Opinion and Order- Page 20**

*LDBrinkman Corp.*, 860 F.2d 1275, 1293 (5th Cir. 1988) (citing *Castleberry v. Branscum*, 721 S.W.2d 270, 271 (Tex. 1986)).

While Royal has demonstrated that Admiral's and Monitor's operations were to some extent interrelated, the court finds that Royal has provided insufficient evidence to support a finding of alter ego, single business enterprise, illegal purpose, or sham to perpetrate a fraud. Royal has not demonstrated, and the bankruptcy court made no findings, that reflect that Admiral and Monitor could be held liable under any of these theories.  Royal also has not pointed the court to any authority by which an entity other than a primary carrier or defense counsel may be held liable for equitable subrogation.

In *Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365, 375 (2007), the Court held that section 105(a) grants bankruptcy judges "broad authority [] to take any action that is necessary or appropriate 'to prevent an abuse of process.'" Section 105(a) authorizes a bankruptcy court to fashion such orders as are necessary to further the substantive provisions of the Bankruptcy Code. *Chiasson v. J. Louis Matherne & Assocs. (In re Oxford Management)*, 4 F.3d 1329, 1333 (5th Cir. 1993) (citations omitted).   Therefore, section 105(a) grants a bankruptcy court authority to exercise its equitable powers to achieve a result the Bankruptcy Code intended. *Perkins Coie v. Sadkin (In re Sadkin)*, 36 F.3d 473, 478 (5th Cir. 1994) (citation omitted).  The "statute does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity." *In re Oxford Management*, 4 F.3d at 1333.

The court does not find that the imposition of joint and several liability was necessary to further the substantive provisions of the Bankruptcy Code.  The court determines that there is no

legal basis to treat Admiral and Monitor as a single entity, and Admiral is the only entity that could be held liable for equitable subrogation, as it is the only primary carrier.

### 5.  Attorney's Fees and Costs

Royal asserts it is entitled to an award of attorney's fees based on the Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2202.  Federal courts follow the American Rule (under which attorney's fees are only recoverable when specifically provided for by contract or statute) in the absence of fee-shifting congressional legislation.  *Utica Lloyd's v. Mitchell*, 138 F.3d 208, 210 (5th Cir. 1998).  Royal cites no applicable fee-shifting congressional legislation.  Section 2202 of the DJA provides that "further necessary or proper relief based on a declaratory judgment or decree may be granted . . . against any adverse party whose rights have been determined by such judgment." *Id.* (quoting 28 U.S.C. § 2202).  Section 2202, however, "does not by itself provide statutory authority to award attorney's fees that would not otherwise be available under state law in a diversity action."  *Mitchell*, 138 F.3d at 210 (quoting *Mercantile Nat'l Bank v. Bradford Trust Co.*, 850 F.2d 215, 218 (5th Cir. 1988)).  "[A]ttorney's fees are recoverable by such a litigant [under § 2202] only where they are recoverable under non-declaratory judgment circumstances." *Mercantile Nat'l Bank*, 850 F.2d at 216.  This means that such a recovery "is confined to two situations: (i) where, under the restrictive American rule attorney's fees are allowed; and (ii) where controlling substantive law permits recovery." *Id.*

A federal court has "equitable power . . . to make awards in addition to regular statutory costs, including a reasonable attorneys' fee . . . ."  *Mercantile Nat'l Bank*, 850 F.2d at 218 (citation omitted).

> [This equitable power has been] exercised most often in cases involving the creation, protection, or distribution of a fund within the jurisdiction of the court, but is broad enough to permit the award of fees and expenses in certain other

rather restricted circumstances. Those other rather restricted circumstances are limited to cases of bad faith, vexation, wantonness, or oppression relating to the filing or maintenance of the action . . . .

*Id.*   The court does not find that such circumstances, related to filing or maintenance of this action, are present in this case and declines to award attorney's fees on this basis of its equitable power.

### a.   Availability of Attorney's Fees in Equitable Subrogation Action

The court now turns to whether Royal is entitled to recover attorney's fees under other controlling substantive law.  The bankruptcy court found that "attorney's fees are available under section [38.001 of the Texas Civil Practices and Remedies Code], since Royal's subrogation claims and Admiral's counter claims, along with their declaratory judgment claims require the court to interpret each of the parties['] respective rights under their insurance contracts."  R. 000037, ¶ 26.  Admiral contends that Royal is not entitled to attorney's fees under section 38.001 of the Texas Civil Practices and Remedies Code because Royal did not prevail on a breach of contract claim.  Royal argues that it is entitled to attorney's fees because this case did involve a suit on a contract, as its equitable subrogation claim was based on Admiral's policy.

The doctrine of "equitable (or legal) subrogation does not depend on contract but arises in every instance in which one person, not acting voluntarily, has paid a debt for which another was primarily liable and which in equity should have been paid by the latter."  *Mid-Continent*, 236 S.W.3d at 774 (citation omitted).   Privity of contract between the insurers is not necessary. *Id.* at 775.  "[E]ven though some jurisdictions treat the distinction between conventional and legal subrogation as merely procedural, Texas does not.  Instead, Texas courts generally allow a subrogee claiming against a third party under conventional subrogation to recover without regard

to the relative equities of the parties." *Vesta Ins. Co. v. Amoco Prod. Co.*, 986 F.2d 981, 988 (5th Cir. 1993) (citation omitted).  It is undisputed that there was no contract between Admiral and Royal, and that Royal was proceeding under a theory of equitable subrogation.

In *American Centennial*, a majority of the justices of the Texas Supreme Court agreed in the concurrence, relying on *Phipps v. Fuqua*, 32 S.W.2d 660, 663 (Tex. Civ. App.—Amarillo 1930, writ ref'd), that as a general rule, subrogation gives indemnity and no more.  *National Union Fire Ins. Co. v. Insurance Co. of N. Am.*, 955 S.W.2d 120, 133 (Tex. App.—Houston [14th Dist.] 1997), *aff'd*, *Keck v. National Union Fire Ins. Co.*, 20 S.W.3d 692 (Tex. 2000).  In other words, a party who successfully brings suit based on the doctrine of equitable subrogation can only recover the amount he or she was required to pay because of the actions of the defendant.  *Id.*  As explained in *National Union,* this view of equitable subrogation was adopted by the Dallas Court of Appeals in *Interfirst Bank Dallas v. United States Fidelity and Guaranty Company*, 774 S.W.2d 391 (Tex. App.—Dallas 1989, writ denied), and relied upon by the Texas Supreme Court in *American Centennial*.  In *Interfirst Bank Dallas*, the court held subrogation rights cover only the amount paid to discharge the obligation; it does not entitle the subrogee to cost or expenses, 774 S.W.2d at 399.  *See also Prudential Prop. & Cas. Co. v. Dow Chevrolet-Olds,* 10 S.W.3d 97, 101 (Tex. App.—Texarkana 1999, pet. dism'd) (citing *American Centennial*, 843 S.W.2d at 485 (holding that the insurer was not entitled to bring its DTPA claim or recover punitive damages or attorney's fees as a subrogee)).  Accordingly, the court determines that subrogation rights cover only the amount paid to discharge the obligation (here, pursuant to *Caliber One*, the amount by which Admiral failed to exhaust its policy limits), plus interest from the date of payment.  Royal, as subrogee, is not entitled to costs or expenses, including attorney's fees.

**Memorandum Opinion and Order- Page 24**

Moreover, Texas law is clear that under section 38.001 of the Texas Civil Practices and Remedies Code a claimant must prevail on a breach of contract claim and recover damages on that breach of contract claim to recover attorney's fees under the statute.

> [A] person may recover reasonable attorney fees . . . in addition to the amount of a valid claim and costs if the claim is for . . .  an oral or written contract.  To recover fees under this statute, a litigant must do two things: (1) prevail on a breach of contract claim and (2) recover damages.

*MBM Fin. Corp. v. Woodlands Operating Co., L.P.*, 292 S.W.3d 660, 666 (Tex. 2009) (quoting Tex. Civ. Prac. & Rem. Code Ann. § 38.001).  "Section 38.001's most basic requirement is that the party seeking attorney's fees must first prevail on a valid contract claim." *Doctors Hosp. 1997, L.P. v. Sambuca Houston, L.P.*, 154 S.W.3d 634, 636 (Tex. App.—Houston [14th Dist.] 2004, pet. abated) (citing *Mustang Pipeline Co., Inc. v. Driver Pipeline Co., Inc.*, 134 S.W.3d 195, 201 (Tex. 2004)).  As it is clear that there was no contract between Admiral or Monitor and Royal, and Royal is proceeding under a theory of equitable subrogation rather than contractual subrogation, the court determines that Royal *has not prevailed on a breach of contract claim*, and it is thus not entitled to recover attorney's fees pursuant to section 38.001 of the Texas Civil Practices and Remedies Code.

Royal cites an unpublished decision, *City of Dallas v. Csaszar*, 1999 WL 1268076 (Tex. App.—Dallas Dec. 30, 1999, pet. denied), for the proposition that attorney's fees can be awarded in an equitable subrogation claim. Br. of Appellee 29.  Royal's characterization is disingenuous at best. In *Csaszar*, a citizen sued two police officers, alleging that the officers physically assaulted him, violating state and federal law.  The City of Dallas (the "City") hired outside counsel to defend the officers, but later withdrew, stating that the alleged loss did not result while the officers were acting within the scope of their employment. The Dallas Police Association

("DPA") then retained attorneys to defend the officers. A federal jury found in favor of the officers on the citizen's claim. DPA then sued the City in state court to recover its defense costs. In its motion for summary judgment, DPA argued: (1) the City had a duty to defend the officers under the City's self-insured liability plan; (2) the City breached its contract by withdrawing its defense of the officers; (3) the City waived its right to assert noncoverage as a defense by initially tendering a defense without a reservation of rights; and (4) DPA was entitled to the costs of Csaszar's and Turner's defense under the theory of equitable subrogation.

The City filed a cross-motion for summary judgment. After a hearing, the trial court denied the City's cross-motion and granted DPA's motion on every ground. The court of appeals affirmed the trial court's grant of DPA's motion for summary judgment with respect to the breach of contract and equitable subrogation claims. The court of appeals also affirmed the trial court's award of attorney's fees, reasoning that "[a]ttorney's fees are available on a suit to enforce a contract and under the declaratory judgment act." *Csaszar*, 1999 WL 1268076, at *7 (citing Tex. Civ. Prac. & Rem. Code Ann §§ 37.009, 38.001-.002 (Vernon 1997)). It is beyond cavil that the court in *Csaszar* based its decision to award attorney's fees on the breach of contract claim on which DPA prevailed and not on the claim of equitable subrogation. Thus, Royal's reliance on this unpublished decision is misplaced.

### b.  Estoppel

In its Supplemental Findings of Fact and Conclusions of Law, the bankruptcy court concluded that section 38.001 of the Texas Civil Practices and Remedies Code does apply, and, alternatively, Admiral and Monitor are estopped by their own pleadings from claiming that this is not a contract dispute. R. 000040, ¶ 12. Royal asserts that this conclusion is correct because Admiral and Monitor repeatedly argued during trial and even in their posttrial briefing that costs

could and should be awarded to the prevailing party pursuant to section 38.001.  Br. of Appellee 28 (citing R. 003724 "Here, Admiral and Monitor are entitled under Section 38.001 *et seq.* to recover an award of attorney's fees from Royal as well as the Trustee because Royal asserted contract-based rights against Admiral and Monitor through subrogation . . . .").  Royal asserts that Admiral and Monitor are estopped from arguing, after losing the case, that this was not a contract dispute.

Normally, "[the Fifth Circuit] considers judicial estoppel a matter of federal procedure and therefore applies federal law."  *Hall v. GE Plastic Pac. PTE, Ltd.*, 327 F.3d 391, 395 (5th Cir. 2003). Judicial estoppel is an equitable doctrine, and the decision whether to invoke it is within the court's discretion.  *Id.* at 396 (citation omitted).

> Judicial estoppel prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding. The purpose of the doctrine is to prevent litigants from playing fast and loose with the courts. In [the Fifth] Circuit, two bases for judicial estoppel must be satisfied before a party can be estopped. First, it must be shown that the position of the party to be estopped is clearly inconsistent with its previous one; and second, that party must have convinced the court to accept that previous position.

*Hall,* 327 F.3d at 396 (internal quotation marks and citations omitted).  The court determines that the doctrine of judicial estoppel is not applicable to this case.  This is not a case based on breach of contract as contemplated under applicable law, and neither party is entitled to attorney's fees. The fundamental flaw in the bankruptcy court's decision to award attorney's fees is that such an award cannot be based on a claim for equitable subrogation.  To be awarded attorney's fees under section 38.001 of the Texas Civil Practices and Remedies Code, a claimant must prevail on a breach of contract claim and recover damages on that claim.  In this case, regardless of which party prevails, neither is entitled to an award of attorney's fees, as there was no claim for

breach of contract.  The bankruptcy court's decision to award attorney's fees to Royal was contrary to law, and a party is not entitled to benefit from an erroneous legal decision.  Judicial estoppel does not bind a court to follow the wrong law.  As judicial estoppel is an equitable doctrine, the decision to invoke it is discretionary.  *Hall,* 327 F.3d at 396.  In this case, invoking judicial estoppel and allowing an award of attorney's fees to Royal, notwithstanding the arguments made to this court and the bankruptcy court, compound a legal error that produces an unacceptable result.  Although Admiral may have taken inconsistent positions, the court determines that under applicable law, Royal is not entitled to attorney's fees and declines to apply the doctrine of judicial estoppel.

### C.  Conclusions of Law: Cross-Appeal by Royal

Royal, by cross-appeal, contends that this court should hold that Admiral and Monitor are liable to it on the bases of fraud, violation of the Texas Insurance Code, and breach of the duty to disclose and settle.  Royal states that Admiral and Monitor made representations directly to it and indirectly through known intermediaries.  Admiral argues that Royal's interpretation of the facts is unsupported by the record and that direct claims by an excess carrier against a primary carrier have never been recognized by any Texas courts.

### 1.  Royal's Fraud Claims

Royal contends that it has demonstrated each of the elements of common law fraud and particularly that Admiral and Monitor made numerous material misrepresentations to it, directly and through known intermediaries.  Specifically, Royal alleges that Admiral or its agents, or representatives, including Monitor, falsely represented to Royal that Admiral had "exhausted" its policy limits and that such exhaustion did not occur.  Further, Royal alleges that such misrepresentations were material and that Royal reasonably and detrimentally relied on the

**Memorandum Opinion and Order- Page 28**

misrepresentations that Admiral had exhausted its policy limits by entering into the Royal Settlement Agreement with the Trustee in 2005, and has been damaged as a result.  Admiral responds that it and Monitor had no substantive communications with Royal at any time during the September 30, 2005, mediation or at any other time that year.  Admiral states that Royal relies on a series a statements allegedly made to Royal not by Admiral or Monitor, but by the Trustee, the Trustee's counsel, a mediator, and unnamed "defense counsel."

The parties have not cited, and this court has not found on its own, any Texas cases in which an excess insurer has sued a primary insurer for fraud.  The parties and the bankruptcy court recognize the dearth of Texas cases on this issue.  *See* Reply Br. of Appellee 2 ("While this case does present unique facts—as all parties have admitted—not previously addressed in any Texas opinion, there is no reason why Judge Hale or this Court should not apply the existing law to these facts.")  *See also* R. 00026-27, ¶7 (in addressing fraud by omission, "This Court is reluctant, as an Article I federal court, to find a legal duty exists without clear authority in Texas case law or in the Texas Insurance Code").

Assuming that Texas courts permit excess carriers to sue a primary carrier on the basis of fraud, the court finds that Royal has not established each of the elements of common law fraud.  The elements of common law fraud under Texas law are: (1) a material misrepresentation; (2) that is false; (3) made with knowledge of its falsity or recklessness as to its truth; (4) made with the intention that it should be acted upon by another party; (5) relied upon by the other party, and (6) causing injury.  *Flaherty & Crumrine Preferred Income Fund Inc. v. TXU Corp.*, 565 F.3d 200, 212 (5th Cir. 2009) (citing *Ernst & Young, L.L.P. v. Pacific Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001).

This court gives deference to the bankruptcy court on issues of fact, as it had the opportunity to observe the evidence during trial and assess the credibility of witnesses.  The bankruptcy court expressed its concern that the Trustee's counsel made certain representations to Royal and stated that, "at best, the evidence has shown that the mediator may not have understood that money was flowing back to an Admiral affiliate in the form of a claim in the bankruptcy case when she informed Royal of the terms of the mediated settlement." R. 000026, ¶5. The bankruptcy court made no factual findings that Admiral or its counsel made any affirmative representations to Royal.  The court is not left with a definite and firm conviction that a mistake has been made.

Royal also contends that Admiral and Monitor are liable for fraud based on statements by Admiral's counsel prior to the September 30, 2005 mediation that Admiral intended to continue defending claims, and if necessary, to pay out its policy limits and that Admiral intended to offer only a small amount in settlement.  Frankly, the evidence cited by Royal demonstrates that counsel for the Trustee introduced the idea to Admiral of a creative settlement whereby Admiral would recoup part of it policy limits.  At the time this idea was introduced in late 2004, Admiral intended to continue defending claims, and, if necessary, pay out its policy limits.  At or near the time of the September 30, 2005 mediation, Admiral changed its tune and acquiesced in the idea of a creative settlement and did not communicate its new plans with Royal.  The only affirmative representations, however, were not made by Admiral or its counsel.  Based upon its own review of the evidence and the bankruptcy court's review of the evidence, this court agrees with the bankruptcy court's finding that Royal has not shown all the elements of common law fraud, namely, an affirmative misrepresentation by Admiral.

Royal also asserts claims for fraud by omission.  Pursuant to Texas law, such fraud may occur when: (1) a party conceals or fails to disclose a material fact within the knowledge of that party, (2) the party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth, (3) the party intends to induce the other party to take some action by concealing or failing to disclose the fact, and (4) the other party suffers injury as a result of acting without knowledge of the undisclosed fact. *Bradford v. Vento*, 48 S.W.3d 749, 754-55 (Tex. 2001).  "As a general rule, a failure to disclose information does not constitute fraud unless there is a duty to disclose the information." *Id.*  "Thus, silence may be equivalent to a false representation only when the particular circumstances impose a duty on the party to speak and he deliberately remains silent." *Id.*  "Whether such a duty exists is a question of law." *Id.*

A duty to disclose can arise by operation of law or by agreement of the parties, or by "some special relationship between the parties, such as a fiduciary or confidential relationship." *Rimade Ltd. v. Hubbard Enters.*, 388 F.3d 138, 143 (5th Cir. 2004) (internal quotation marks and citation omitted).  Royal argues that such a duty arises by operation of law, pursuant to Texas Insurance Code § 541.061.  As noted by the bankruptcy court, the parties produced no cases directly on point regarding this issue.  The bankruptcy court further observed that it may be the custom and practice in the industry for a primary insurer to keep an excess insurer informed of settlement negotiations, but it found no legal duty to disclose that would lead to a fraud by omission claim.  R. 00026, ¶¶ 6-7.  This court agrees.

Texas law does not recognize a duty flowing from primary insurers to excess insurers.  In *American Centennial*, in holding that an excess carrier may bring an equitable subrogation action against the primary carrier, the court stressed that its holding does not impose new or additional burdens on the primary carrier beyond that indicated in the *Stowers* and *Rangers* decisions.  843

S.W.2d at 483.  The court noted that the plaintiffs urged it to recognize a direct duty from the primary to excess insurer.  The court, however, declined to do so, and has not since imposed any direct duty.  *See id.*  Moreover, for the reasons explained in section III(C)(2) below, the court determines that the Texas Insurance Code is inapplicable to the facts of this case.

To the extent that Royal asserts that a duty arose by agreement as a result of Admiral promising Royal that it would tell Royal if its settlement plans changed, this court is unconvinced.  The promise to which Royal refers is an email from Don Martinson, counsel for Royal, to Paul Rowe, (Royal's claims handler with responsibility for assessing covering in the Cool Partners litigation from 2002 through December 2005, R. 003414-18).  In the email dated July 8, 2005, Martinson explained to Rowe that Guy Hohmann (outside counsel for Admiral, R. 007274-76) stated that he believes:

> that Admiral has now concluded that Admiral is better off accelerating the scheduling of depositions of two Admiral underwriters so that the Admiral [motion for summary judgment] can be heard before there are further settlement negotiations.  If the [motion for summary judgment] is denied by Judge Hale then Admiral would likely figure out how best to exhaust their remaining limits and dismiss their [declaratory judgment] action.  Hohmann has told Admiral that their chances of getting the MSJ granted are 50-50.  He also said that he and Admiral have also concluded that, absent a favorable [motion for summary judgment] ruling by Judge Hale, their limits will exhaust one way or the other, either by payment of defense costs or indemnity costs or both.
>
> Hohmann said that if Admiral changes their game plan, as stated herein, he will let us know.

R. 007340.  The court finds that this statement to keep Royal informed of a change in "game plan" to be banter between attorneys and certainly not an agreement as contemplated by Texas law.  Also, to the extent that Royal argues that Admiral is liable for fraud based only on the promise to keep it informed, the court is equally unconvinced.  "A promise to do an act in the future is actionable fraud when made with the intention, design and purpose of deceiving, and

with no intention of performing the act." *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986).   There is no evidence, direct or circumstantial, that establishes, or from which the court can reasonably infer, Admiral intended to deceive or mislead Royal by Guy Hohmann's communication to Don Martinson.   Rather, Admiral's communications with the Trustee's counsel at or around the same time demonstrate that Admiral's intent was to continue defending claims, and if necessary, to pay out its policy limits. *See* R. 007296-97 (In April 2005, Trustee's counsel states to Admiral's counsel that Admiral's insureds are continuing to notice depositions; defense costs are quickly increasing; and the amount he could return in a creative settlement is nearly gone).  *See also* R. 007335 (In June 2005, Trustee's counsel states to Admiral's counsel that if mediation is not going to take place, he strongly suggests that Admiral settle with the third parties asserting smaller claims because the deposition costs are greater that the costs of the claims.) The Trustee's counsel communications to Royal in June 2005 also reflect this understanding. *See* R. 007308 (In June 2005, Trustee's counsel states that Guy Hohmann (Admiral's counsel) is committed to paying until Admiral's $5 million policy limits are exhausted.)  Admiral's change in settlement intentions and failure to keep Royal informed are not sufficient evidence of an intent to deceive or fraud.  One's later decision not to comply with a promise or contract cannot support a finding that it never intended to perform under the promise or contract.  *Kevin M. Ehringer Enters. v. McData Servs. Corp.*, 646 F.3d 321, 327, n.3 (5th Cir. 2011).

Several courts of appeals in Texas have held that a duty to disclose may arise in an arm's-length transaction in the following situations: (1) when one voluntarily discloses information, he has a duty to disclose the whole truth; (2) when one makes a representation, he has a duty to disclose new information when he is aware the new information makes the earlier representation

misleading or untrue; and (3) when one makes a partial disclosure and conveys a false impression, he has a duty to speak. *See Playboy Enters. v. Editorial Caballero, S.A. de C.V.*, 202 S.W.3d 250, 260 (Tex. App.— Corpus Christi, 2006, pet. denied); *Four Bros. Boat Works, Inc. v. Tesoro Petroleum Cos.*, 217 S.W.3d 653, 670-671 (Tex. App.—Houston [14th Dist.] 2006, pet. denied). The court is not convinced that the Texas Supreme Court has recognized such a duty.

> Several courts of appeals have held that a general duty to disclose information may arise in an arm's-length business transaction when a party makes a partial disclosure that, although true, conveys a false impression. The Restatement (Second) of Torts section 551 also recognizes a general duty to disclose facts in a commercial setting. RESTATEMENT (SECOND) OF TORTS § 551 (1977). In such cases, a party does not make an affirmative misrepresentation, but what is said is misleading because other facts are not disclosed. We have never adopted section 551.

*Bradford v. Vento*, 48 S.W.3d 749, 755-756 (Tex. 2001). In any event, such a duty, if recognized by the Texas Supreme Court, is limited to an arm's-length transaction. *See id*; *Playboy*, 202 S.W.3d at 260. There is little Texas case law defining what constitutes and arm's-length transaction. The Federal Circuit, however, provides an instructive definition. *See Allegheny Ludlum Corp. v. United States*, 367 F.3d 1339, 1348-49 (Fed. Cir. 2004) (stating that a negotiation or transaction is conducted at "arm's length" if it is "between two parties who are not related or not on close terms and who are presumed to have roughly equal bargaining power" and "not involving a confidential transaction." (quoting Black's Law Dictionary 103 (7th ed. 1999)). Royal has not argued, and the record does not support, that there was any negotiation or transaction between Admiral and Royal. There are simply too many gaps for this court to fill in to infer reasonably that there was an arm's-length transaction.

**Memorandum Opinion and Order- Page 34**

Royal contends that Admiral made a representation or partial disclosure that led Royal to erroneously believe that it was responsible for the payment of the incurred fees of defense counsel.  This court, however, has already determined that the only affirmative representations or disclosures were not made by Admiral or its counsel.

While Admiral's conduct may not be cause for approbation, in light of the nonexistence of Texas authority supporting a claim of fraud by omission under facts that are identical or similar to those of this case, the court is reticent to conclude that Admiral voluntarily assumed a duty to disclose information to Royal.  Accordingly, the court determines that Royal has not established its claim of fraud by omission.

### 2.  Royal's Claims for Statutory and Punitive Damages and Breach of a Duty to Settle

Royal asserts direct claims against Admiral under Texas Insurance Code sections 541.060 (unfair settlement practices), 541.061 (misrepresentations regarding an insurance policy), and 541.151 (unfair competition and deceptive trade practices).  Royal asserts it is entitled to treble damages under the Texas Insurance Code and also asserts a claim for punitive damages under sections 41.003 (a) and 41.001(5) of the Texas Civil Practices and Remedies Code.  Simply put, these claims are not cognizable under Texas law.  *See Texas Medical Ass'n v. Aetna Life Ins. Co.*, 80 F.3d 153, 159 (5th Cir. 1996) (The right to sue has been limited by Texas courts to persons in privity of contract with the insurer on an insurance policy or an intended beneficiary of an insurance policy.)

The bankruptcy court observed that Texas courts have expanded the right to sue based on misrepresentations regarding an insurance policy to those with a direct relationship to the insurance company, such as health care providers. R. 000027, ¶ 9 (citing *Brown & Brown of*

*Tex., Inc. v. Omni Metals, Inc.*, 317 S.W.3d 361, 382 (Tex. App.—Houston [1st Dist.] 2010) "Hospitals and other health care providers must, and do, rely upon the insurance carriers['] representations of coverage in making their decision regarding admission of potential patients. . . . To insulate the insurance carriers from liability leaves the medical care provider without recourse against the party causing its damage, if it acts in reliance on the representation of coverage.") The bankruptcy court was reluctant to stretch this expansion beyond health care providers without guidance from the Texas courts. This court also will not expand the right to sue beyond that established by the Texas courts. Further, this court reiterates its prior determination that there were no misrepresentations directly from Admiral to Royal.

In *American Centennial*, the Texas Supreme Court declined to allow an excess insurance carrier to sue a primary insurance carrier directly. The court, however, did permit an excess insurer to assert an equitable subrogation claim against the primary carrier based on the rights of the insureds. Some jurisdictions have permitted a primary carrier to pursue a direct action against an excess carrier. In *American Centennial*, while the Texas Supreme Court did not foreclose the opportunity to later adopt the "direct action" theory, the court found that the excess carriers appeared to have an adequate remedy using equitable subrogation. Therefore, the court declined to permit a direct action. American Centennial, 843 S.W.2d at 482-83.

In *Caliber One*, the court stated:

> The concurring opinion [in *American Centennial*] stated that "I assume from its reliance on the *Stowers* and *Ranger County* cases, and would so hold, that the excess carriers' only cause of action is for negligence." The context in which this statement appears should make clear that the court was emphasizing its conclusion that an excess carrier "is not entitled to damages in its own right, or statutory or punitive damages," and that an excess carrier could not proceed on theories of "breach of a duty of good faith and fair dealing, . . . violations of the Texas Deceptive Trade Practices-Consumer Protection Act," or "article 21.21 of the Texas Insurance Code," all of which provided extra-contractual remedies to

**Memorandum Opinion and Order- Page 36**

> insureds.   In saying that an excess carrier's "only cause of action is for negligence," the court was not saying that contractually based rights were foreclosed.   The court was simply placing limits on the availability of tort and extra-contractual remedies.

*Caliber One*, 465 F.3d at 618 (footnotes omitted).   This court declines to recognize a direct cause of action by an excess insurer against a primary insurer, including claims for statutory and punitive damages, as Texas courts have not recognized one.   *See Federal Ins. Co. v. Everest Nat'l Ins. Co.*, 257 S.W.3d 771, 775-776 (Tex. App.—Dallas 2008), rehearing overruled (Jul 28, 2008), review denied (Feb 13, 2009) ("Since Texas law does not recognize a direct cause of action between carriers, a subrogated insurer must sue on subrogated rights it has expressly obtained from its insured.") (citing *Caliber One*, 465 F.3d at 625).

Moreover, in *National Union*, the court of appeals, relying on *American Centennial* discussed at length that Texas law does not permit an excess carrier bringing a suit based on equitable subrogation to recover statutory or punitive damages.   "On the issue of statutory or punitive damages and equitable subrogation, a majority of the justices agreed that as a general rule, subrogation gives indemnity and no more."   *National Union*, 955 S.W.2d at 133 (citing *American Centennial*, 843 S.W.2d at 485).   The court of appeals further stated:

> Therefore, based on the general tenets of the doctrine of equitable subrogation, a majority of the supreme court agreed that an excess carrier is not entitled to recover damages to recover statutory or punitive damages. We will follow the view of the majority of the supreme court justices, and therefore hold that an excess carrier, who brings suit based on the doctrine of equitable subrogation, cannot recover statutory or punitive damages from the primary carrier or the insured's defense counsel.

*Id.* (internal citation omitted).   Similarly, in addressing the plaintiff's Deceptive Trade Practices Act, Insurance Code, and gross negligence claims, the court said:

> Though the main opinion declined to determine whether the doctrine of equitable subrogation would extend to permit claims for gross negligence and

**Memorandum Opinion and Order- Page 37**

> violations of the DTPA and Insurance Code, the court's reliance on *Stowers* and
> *Ranger County* moved a majority of the justices to agree, in the concurring
> opinion, that the excess carriers only cause of actions is for negligence. We agree
> with the position stated in the concurrence.

*National Union*, 955 S.W.2d at 134 (citing *American Centennial*, 483 S.W.2d at 486).   Royal

invites the court to recognize a direct claim against a primary carrier for its alleged misconduct

detrimental to the excess insurer.   Br. of Appellee 21.   In light of Texas case law, this court

declines to do so.

### 3.   Royal's Claim for Damages

Royal contends that the bankruptcy court should have awarded its full "overpayment" of

$2,833,598.   Royal explains that Admiral's settlement had the effect of forcing it to pay millions

more that it otherwise would have been obligated to pay.   Royal's alleged overpayment has three

components: (1) the approximately $1 million dollars in unsecured bankruptcy claims received

by Monitor, purportedly paid by Royal's settlement monies; (2) Royal's payment of

approximately $1.6 million dollars in outstanding fees and costs of defense counsel, which the

trustee had agreed to pay as part of its mediated settlement with Admiral; and (3), the alleged

waste of $1,055,771 by Admiral because it paid defense costs through the bankruptcy estate,

rather than directly to defense counsel, as per its prior course of business. Br. of Appellee 51,

App. 2

The bankruptcy court, however, determined that the outstanding defense costs would

have been paid by either Admiral, as the primary insurer, or Royal, as the excess insurer.   R.

000036, ¶ 25. Also, the bankruptcy court could not determine whether the Trustee and the

Rosenthal plaintiffs would have accepted less in settlement from Royal by virtue of paying these

fees outside of the estate. *Id.*   The bankruptcy court observed:

> It is unfortunate that the Trustee and his counsel chose to funnel the defense costs through the bankruptcy estate as part of the settlement, rather than have them paid directly, resulting in higher fees paid to the professionals in the bankruptcy case, but Royal did not prove that it would have been required to pay less, or that a settlement was possible at a lower amount if things had been done differently.

R. 000036, ¶ 25. This court agrees.  The alleged "overpayment" of $2,833,598 by Royal is speculative and cannot serve as the basis for awarding damages.

## IV.    Conclusion

For the reasons stated herein, the court **affirms in part** and **reverses in part** the judgment of the bankruptcy court entered on October 25, 2010.   The court **determines** that the bankruptcy court erred in finding the amount of damages to be awarded to Royal.  Accordingly, the court **reverses** the bankruptcy court's finding as to damages and **modifies** the finding to reflect the correct amount of damages to which Royal is entitled.   The correct amount of damages awarded to Royal should have been **$923,415.85**, and the court **awards** this amount rather than the $987,981.86 awarded by the bankruptcy court.

The court **will award** prejudgment interest from the dates, as set forth in the Stipulation filed on October 14, 2010, that each payment was made by the Trustee to Monitor as a result of the transfer of the Pegasus Claims through October 25, 2010.   The amount of prejudgment interest will be set forth in the judgment once the amount is determined by the court.  The court will use a rate of five percent per annum.  The court also **determines** that Admiral has waived its right to object to the rate of prejudgment interest, as it filed no objections to such rate.  Admiral objected *only* to the amount of damages that the bankruptcy court found.  Prejudgment interest is to be calculated on **$923,415.85.**  The parties are to calculate the amount of prejudgment interest in accordance with the court's ruling and submit it to the court **by April 6, 2012**.  The court **will grant** postjudgment interest on the amount awarded.   The Stipulation for Supplementation of

Record on Appeal, filed March 29, 2012, shall be included by the clerk of this court as part of the record on appeal if this case is appealed beyond this court.

With respect to the bankruptcy court's conclusions of law, the court **determines** that the bankruptcy court erred when it held that Admiral and Monitor were jointly and severally liable and when it awarded attorney's fees and costs to Royal. Accordingly, the court **reverses** those portions of the bankruptcy court's judgment. In all other respects, the court **affirms** the judgment of the bankruptcy court.

With respect to costs pursuant to Rule 54(d)(1) of the Federal Rules of Civil Procedure, "[u]nless a federal statute, these rules, or a court order provides otherwise, costs—other than attorney's fees—should be allowed to the prevailing party." Rule 54(d) creates a strong presumption that the prevailing party will be awarded costs. *Manderson v. Chet Morrison Contractors., Inc*., 666 F.3d 373, 384 (5th Cir. 2012) (citation omitted). In this case, however, this was an appeal and a cross-appeal. Neither side is a prevailing party in the traditional sense. This is a split decision, and, under the circumstances, the court believes that the parties should bear their own costs of appeal. Accordingly, the court taxes costs against the party that incurred them.

The clerk of the court, pursuant to Bankruptcy Rule 8016, is directed to prepare, sign, and enter judgment in accordance with this memorandum opinion and order once the court has determined the amount of prejudgment interest to be awarded to Royal.

**It is so ordered** this 30th day of March, 2012.

Sam A. Lindsay
United States District Judge